Elliot Gale (Bar #263326)
egale@gajplaw.com
Joe Angelo (Bar #268542)
jangelo@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiffs
Kenneth and Daina Reckelhoff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| Kenneth and Daina Reckelhoff<br><br>Plaintiffs,<br><br>v.<br><br>Experian Information Solutions, Inc.; Equifax Information Services, LLC; JPMorgan Chase Bank, N.A.; and Select Portfolio Servicing, Inc.<br><br>Defendants. | CASE NO.: 5:20-cv-00108<br><br>PLAINTIFFS' COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act;<br>2. Violation of California Consumer Credit Reporting Agencies Act |

COMES NOW Plaintiffs Kenneth and Daina Reckelhoff, an individual, based on information and belief, to allege as follows:

## **INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. §

1681i(a)(4)), 15 U.S.C. §1681i(a)(5)(A)), and the California Consumer Credit Reporting Agencies Act, California Civil Code §1785.25(a).

2. Plaintiffs seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiffs' mortgage account with Select Portfolio Servicing, Inc. (hereinafter "SPS") and JPMorgan Chase Bank, N.A. (hereinafter "Chase").

3. Here, both SPS and Chase continue to report inaccurate and incomplete information regarding Plaintiffs' mortgage account.

4. SPS's reporting of the account is wholly incomplete and misleading. Specifically, SPS and Chase both continue to report the mortgage accounts as involved in an active bankruptcy, as well as discharged, despite Plaintiffs not being in bankruptcy and the accounts at issue not subject to any bankruptcy discharge. Moreover, nothing on the tradelines reflect the accounts relate to the same debt. Consequently, Plaintiffs reports appear to have two adverse mortgage accounts rather than one positive mortgage account.

5. Such reporting is confusing, misleading, and adversely impacts Plaintiffs' credit worthiness.

6. Plaintiffs' credit reports have been disseminated to third parties since the completion of their Chapter 13 bankruptcy.

7. Plaintiffs' credit has also been damaged as a result of the inaccurate and misleading reporting and Plaintiffs are unable to obtain favorable interest rates as a result of the inaccurate SPS and Chase reporting.

8. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting

methods undermine the public confidence, which is essential to the continued functioning of the banking system.

9. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

## JURISDICTION & VENUE

10. Plaintiffs re-allege and incorporate herein by reference the allegations in each and every paragraph above, fully set forth herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

12. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

13. Plaintiffs allege that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

14. Plaintiffs allege that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

15. Plaintiffs allege that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiffs' attempt to improve their FICO Score.

16. In the alternative Plaintiffs allege that each and every Defendants action were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

//

### FICO, Inc.

17. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

18. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

19. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

20. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

21. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

22. There are 28 FICO Scores that are commonly used by lenders.

23. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

24. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

25. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

26. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.

27. Each of the five factors is weighted differently by FICO.

28. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

29. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score.  Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

30. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

31. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

32. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

### e-OSCAR

33. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

34. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

35. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**Metro 2**

36. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

37. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

38. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

39. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

40. The CDIA is *the* expert on accurate credit reporting. In support of her allegations Plaintiff avers the following:

   a. The CDIA offers a FCRA certificate program for all CRAs.

   b. The CDIA offers a FCRA awareness program for all CRAs.

   c. The CDIA offers a FCRA Certificate program for DFs.

   d. The CDIA offers a FCRA awareness program for DFs.

   e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

   f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

   g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

41. The CDIA's Metro 2 is accepted by all CRAs.

42. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

43. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

44. The three main credit bureaus helped draft the CRRG.

45. The CRRG is not readily available to the public. It can be purchased online for $229.45.

46. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

50. All three major CRAs are members of the CDIA

51. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

**Consumer Information Indicator**

52. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.

53. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

54. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

55. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

56. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

57. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

58. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

59. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

60. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

61. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

62. The CII Metro 2 Code "Q" is used when a bankruptcy plan is complete and will remove prior bankruptcy codes on the account; the CII Q is used on liabilities that are not discharged in bankruptcy (such as a mortgage).

63. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

64. Failure to update the CII to a "Q" on a secured non-discharged debt results in it appearing that a consumer, like Plaintiffs, included an account in a bankruptcy proceeding despite not having done so.

65. It also may result (as is the case here) where it appears an account continues to be in an *active* bankruptcy when in fact no bankruptcy case is pending.

66. It also results in the account being calculated as a major derogatory or adverse account despite the fact it was not included or discharged.

67. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

**Plaintiffs' Dispute**

68. On November 4, 2019 Plaintiffs ordered a credit report from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiffs' creditors after their Chapter 13 bankruptcy was completed.

69. Plaintiffs noticed various delinquent and adverse trade lines on their November 4, 2019 credit report.

70. One such trade line was reported by SPS and contained incomplete information regarding their mortgage, such as SPS reporting that the account was subject to a wage earner plan and included and/or discharged in bankruptcy and with an incomplete payment history.

71. SPS also failed to notate timely payments on the account despite Plaintiffs making such payments.

72. Similarly, Chase reported that Plaintiffs' mortgage account as included in an active bankruptcy as well as discharged in bankruptcy.

73. In response, Plaintiffs disputed the SPS and Chase trade lines via certified mail with Experian, Equifax, and TransUnion on November 11, 2019.

74. Plaintiffs' dispute letters specifically put SPS and Chase on notice that the account should not be listed as discharged, included in bankruptcy, and

making payments under a wage earner plan as the account was not discharged and not currently subject to an active bankruptcy case.

75. The dispute also requested that the SPS and Chase tradelines be updated to reflect that the account was not discharged and provided information that their mortgage account was current, open, and in good standing.

76. Proof of Plaintiffs' ongoing mortgage payments were included with the dispute letters to verify payments were being made and accepted by SPS.

77. Plaintiffs are informed and believe that each CRA received Plaintiffs' dispute letter and in response sent Plaintiffs' dispute to SPS and Chase via an ACDV through e-OSCAR.

78. On December 16, 2019 after the statutory time period had elapsed for Plaintiffs ordered a second credit report from Experian, Equifax, and TransUnion for the sole purpose to ensure Plaintiffs' accounts with SPS and Chase had in fact been updated.

**Inaccuracy – SPS**

79. Plaintiffs were frustrated to see that Defendant SPS did not properly update the account.

80. SPS was still reporting the account as included and/or discharged in bankruptcy and making payments under a wage earner plan despite the account not being included or discharged in Plaintiffs' Chapter 13 bankruptcy.

81. SPS's reporting is inaccurate because Plaintiffs did not include or seek to discharge their mortgage with SPS in their bankruptcy filing.

82. SPS's reporting is entirely incomplete, misleading and technically inaccurate.

83. The reporting is incomplete because the report lacks any updates on the account, including reflecting that the account was not discharged and is not still subject to any type of bankruptcy proceeding.

84. SPS should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiffs completed their chapter 13 plan or at least removed the bankruptcy notations.

85. As it stands it appears that SPS continues to report the CII "D" making it appear that Plaintiffs continue to be in an active bankruptcy and that the account may or may not be subject to Plaintiffs' discharge given that such a discharge has been received.

86. To be clear, it is impossible for accuracy purposes for SPS to accurately report a CII "D" post-discharge and after the completion of a Chapter 13 Plan as the CII "D" should only be reported during an active bankruptcy.

87. Moreover, despite SPS receiving, accepting, and applying payments to its account none of those timely payments are reflected in Plaintiff's payment history. Instead, the payment history boxes remain blank making it appear at best unclear whether or not Plaintiffs actually paid their mortgage on time.

88. Plaintiffs are no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy. As a result, SPS should know that the CII "D" cannot possibly be accurate.

89. Plaintiffs believe that SPS received a copy of Plaintiffs' dispute and confirmed that the account was included and/or discharged in bankruptcy.

## Willfulness

90. This was not a negligent act by Defendant SPS but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore their credit.

91. SPS's reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account makes it appear that Plaintiffs sought to

discharge and include their mortgage in their Chapter 13 bankruptcy proceeding and that Plaintiffs remains in an active Chapter 13.

92. SPS knows that its reporting must be accurate and complete.

93. SPS is aware that Plaintiffs' mortgage is not included or discharged in bankruptcy and is an open account as Plaintiffs are making, and SPS is accepting, payments on the mortgage account.

94. SPS, with knowledge of Plaintiffs' dispute, chose NOT to update Plaintiffs' credit report and instead still reported that the account was subject to a Chapter 13 bankruptcy and otherwise may or may not be discharged.

95. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Inaccuracy – Chase**

96. Plaintiffs were frustrated to see that Defendant Chase did not properly update the account.

97. Chase was still reporting the account as included and/or discharged in bankruptcy and making payments under a wage earner plan despite the account not being included or discharged in Plaintiffs' Chapter 13 bankruptcy.

98. Chase's reporting is inaccurate because Plaintiffs did not include or seek to discharge their mortgage with Chase in their bankruptcy filing.

99. Chase's reporting is entirely incomplete, misleading and technically inaccurate.

100. The reporting is incomplete because the report lacks any updates on the account, including reflecting that the account was not discharged and is not still subject to any type of bankruptcy proceeding.

101. Chase should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiffs completed their chapter 13 plan or at least removed the bankruptcy notations.

102. As it stands it appears that Chase continues to report the CII "D" making it appear that Plaintiffs continue to be in an active bankruptcy and that the account may or may not be subject to Plaintiffs' discharge given that such a discharge has been received.

103. To be clear, it is impossible for accuracy purposes for Chase to accurately report a CII "D" post-discharge and after the completion of a Chapter 13 Plan as the CII "D" should only be reported during an active bankruptcy.

104. Plaintiffs are no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy.  As a result, Chase should know that the CII "D" cannot possibly be accurate.

105. Moreover, despite Chase receiving, accepting, and applying payments to its account none of those timely payments are reflected in Plaintiff's payment history. Instead, the payment history boxes remain blank making it appear at best unclear whether or not Plaintiffs actually paid their mortgage on time.

106. Plaintiffs believe that Chase received a copy of Plaintiffs' dispute and confirmed that the account was included and/or discharged in bankruptcy.

**Willfulness**

107. This was not a negligent act by Defendant Chase but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore their credit.

108. Chase's reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account makes it appear that Plaintiffs sought to

discharge and include their mortgage in their Chapter 13 bankruptcy proceeding and that Plaintiffs remains in an active Chapter 13.

109. Chase knows that its reporting must be accurate and complete.

110. Chase, with knowledge of Plaintiffs' dispute, chose not to update Plaintiffs' credit report and instead still reported that the account was subject to a Chapter 13 bankruptcy and otherwise may or may not be discharged.

111. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Damages**

112. As a result of the incorrect reporting, Plaintiffs have suffered economic loss, diminished credit, and emotional harm.

113. SPS and Chase's inaccurate reporting have been transmitted to third parties since Plaintiffs completed their Chapter 13 case and negatively impacted Plaintiffs' ability to obtain credit.

114. Plaintiffs are also fearful that any credit applications will continue to harm their credit score.

115. The actions of Experian, Equifax, Chase, and SPS as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**<u>FIRST CAUSE OF ACTION</u>**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Experian and Equifax)

**Experian Information Solutions and Equifax Information Services, LLC – Failure to Assure Credit Reporting Accuracy.**

116. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

117. Experian and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible

accuracy in the preparation of Plaintiffs' credit reports and credit files it published and maintained concerning Plaintiffs.

118. Had Experian and Equifax maintained reasonable procedures to assure maximum accuracy Experian and Equifax would never have allowed Defendant SPS and Chase to report the account as described herein.

119. Both Chase and SPS appear to be reporting a "CII" that refers to an active bankruptcy.

120. Experian and Equifax all are reporting that Plaintiffs have completed their bankruptcy and therefore should know that SPS and Chase's reporting cannot possibly be accurate.

121. Even assuming the CRAs are not sophisticated enough to address this obvious contradiction, Plaintiffs disputed the account and the CRAs still did not fix the issue.

122. Instead, the account remains unchanged.

123. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiffs suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

124. The violations described herein by Experian and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

125. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.

126. Such a finding should shock the conscience.

127. When those errors are disputed Equifax, TransUnion, and Experian intentionally send consumer disputes to employees who do not live within the continental United States.

128. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

129. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendants Experian and Equifax receive little to no training concerning how to accurately report consumer debt.

130. Instead these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)

131. Experian and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

132. Experian and Equifax have intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

133. Experian and Equifax also allowed SPS and Chase to report its account with inaccurate information despite specifically being told in the dispute letter why the information SPS and Chase were both reporting was incorrect.

134. Experian and Equifax are members of the consumer data industry association

135. The consumer data industry association has specifically briefed and AGREED with Plaintiff that the reporting of SPS and Chase in the present matter is inaccurate. See **Brief for the Consumer Data Industry Association as Amicus Curia in Support of Defendants-Appellees** in *Alan R. Riekki v. Bayview Financial Loan Servicing*, et al., Case No 16-16438 in The United States Court of Appeals for the Ninth Circuit.

16

136. Despite the CRAs having actual knowledge of Plaintiffs' bankruptcy, SPS and Chase reporting the account included in an ongoing bankruptcy, and the bankruptcy actually being closed, Experian and Equifax continue to allow SPS and Chase to report the account included and discharged in bankruptcy.

137. Not only are Experian and Equifax allowing SPS and Chase to report in a manner that they know is factually impossible (an account cannot be included in an on-going bankruptcy if the bankruptcy has been closed) but in a manner the CDIA has specifically briefed as inaccurate.

138. As a result, Experian and Equifax are allowing SPS and Chase to report in a manner they know is factually and legally inaccurate.

139. Consequently, Defendants Experian and Equifax are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

140.  In the alternative, Experian and Equifax were at least negligent, which entitle Plaintiffs to recovery under 15 U.S.C. § 1681o.

141. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**SPS and Chase – Failure to Reinvestigate.**

142.    Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

143.    15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update

and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

144. Defendants SPS and Chase violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

145. The CRAs provided notice to SPS and Chase that Plaintiffs were disputing the inaccurate and misleading information, but SPS and Chase failed to conduct a reasonable investigation of the information as required by the FCRA.

146. Based on Plaintiffs' dispute, SPS and Chase should have known that its reporting was incomplete as Plaintiffs' dispute letters highlighted the problems with the tradeline.

147. The most basic investigation would simply involve reading Plaintiffs' dispute letters.

148. Plaintiffs allege SPS and Chase did not review well established industry standards for credit reporting.

149. If SPS and Chase had reviewed such standards SPS and Chase would have seen its reporting was not in compliance and in accordance with the CRRG and consequently inaccurate and or incomplete.

150. Moreover, had SPS and Chase done any investigation whatsoever it would have uncovered that SPS and Chase's reporting showed an active bankruptcy when in fact Plaintiffs were not actually in bankruptcy at all.

151. The lack of investigation is unreasonable.

152. Plaintiffs further allege that SPS and Chase have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian and Equifax – Failure to Reinvestigate Disputed Information.**

153. Plaintiffs re-allege and incorporate herein the allegations in each and every paragraph above as though fully set forth herein.

154. After Plaintiffs disputed the account mentioned above, Experian and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

155. Experian and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

156. Experian and Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiffs explicitly explained that the SPS and Chase accounts were not included or discharged in their bankruptcy and provided verification that ongoing payments were being made on this mortgage.

157. Plaintiffs allege that Experian and Equifax have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

158. Experian and Equifax are not passive entities bound to report whatever information a DF provides.

159. Given the aforementioned, Plaintiffs allege that Experian and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

160. Experian and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

161. Experian and Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiffs' dispute letters.

162. Experian and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

163. Experian and Equifax intentionally, willfully or with reckless disregard for Plaintiffs' accuracy did no investigation whatsoever given that Experian and Equifax's general policy is to simply parrot whatever information a data furnisher sends.

164. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

## **THIRD CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants Experian and Equifax)

**Experian and Equifax – Failure to Review and Consider All Relevant Information.**

165. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

166. Experian and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiffs.

167. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

168. The violations by Experian and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

169. In the alternative Experian and Equifax were negligent, which entitle Plaintiffs to recovery under 15 U.S.C. § 1681o.

170. Plaintiffs is entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A)
Against Defendants Experian and Equifax)

**Experian and Equifax– Failure to Delete Disputed and Inaccurate Information.**

171. Plaintiffs re-allege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

172. Experian and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiffs' credit file or modify the item of information upon a lawful reinvestigation.

173. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

174. The violations by Experian and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

175. In the alternative, Experian and Equifax were negligent, which entitle Plaintiffs to recovery under 15 U.S.C. § 1681o.

176. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## **FIFTH CAUSE OF ACTION**

(Violation of California Consumer Credit Reporting Agencies Act
California Civil Code § 1785.25(a) Against Defendants SPS and Chase)

### **SPS and Chase– Reporting Inaccurate Information to CRAs.**

177. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

178. In the regular course of its business operations, SPS and Chase routinely furnishes information to credit reporting agencies pertaining to transactions between Defendants and Defendant's consumers, so as to provide information to a consumer's credit worthiness, credit standing and credit capacity.

179. SPS and Chase intentionally and knowingly reported misleading and inaccurate account information to the CRAs that did not follow with well-established industry standards.

180. Plaintiff alleges that SPS and Chase re-reported the information contained herein in violation of California Civil Code § 1785.25(a).

181. Plaintiffs also allege that SPS and Chase both had reason to know that the information reported on Plaintiffs' account were misleading, inaccurate, and incomplete.

182. Plaintiffs allege that both Chase and SPS had reason to know that by not complying with well-established industry standards lenders will draw a more negative inference with respect to Plaintiff's credit worthiness.

183. Plaintiffs allege that the dispute letters from all three credit reporting agencies, the consumer data industry resource guide, and results of its investigation should have provided notice to SPS and Chase of its misleading and inaccurate reporting.

184. SPS and Chase both failed to notify Experian and Equifax that the information Defendants Chase and SPS re-reported was inaccurate before the end of 30 business days, in violation of California Civil Code § 1785.25(a).

185. SPS and Chase's communications of false information, and repeated failures to investigate, and correct their inaccurate information and erroneous reporting were done knowingly, intentionally, and in reckless disregard for their duties and Plaintiffs' rights.

186. As a direct and proximate result of SPS and Chase's willful and untrue communications, Plaintiffs have suffered actual damages including but not limited to reviewing credit reports from all three consumer reporting agencies, time reviewing reports with counsel, sending demand letters, diminished credit score, denial of credit, and such further expenses in an amount to be determined at trial.

Wherefore, Plaintiffs prays for judgment as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n and California Civil Code § 1785.31;

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n; and California Civil Code § 1785.31

4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o; California Civil Code § 1785.31;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6.  For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated:        January 15, 2020              */s/ Joe Angelo*
                                             Joe Angelo
                                             Elliot Gale
                                             Attorneys for Plaintiffs

## <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand trial of this matter by jury.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: January 15, 2020                      */s/ Joe Angelo*
                                             Joe Angelo
                                             Elliot Gale
                                             Attorneys for Plaintiffs